IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
|     Respondent, | No. CR S-02-0519 KJM DAD P |
| vs. | |
| ESEQUIEL QUESADA-GARCIA | |
|     Movant. | FINDINGS AND RECOMMENDATIONS |

Movant is a federal prisoner proceeding pro se with a motion under 28 U.S.C. § 2255 to vacate, set aside or correct his sentence. He was convicted by a jury in the Eastern District of California on March 22, 2004, on all three counts of the federal indictment charging him with: (1) conspiring to manufacture at least 1,000 marijuana plants, in violation of 21 U.S.C. § 841(a)(1); (2) manufacture of at least 1,000 marijuana plants, in violation of 21 U.S.C. § 841(a)(1); and (3) possessing a firearm in furtherance of drug trafficking crimes, in violation of 18 U.S.C. § 924 (c)(1)(A)(i). On June 7, 2004, the then-assigned District Judge sentenced petitioner to 121 months in the custody of the Bureau of Prisons on each of Counts 1 and 2, to be served concurrently, and 60 months in the custody of the Bureau of Prisons on Count 3, to be

/////

/////

served consecutively to the sentences imposed on Counts 1 and 2. In addition, the court imposed five-year terms of supervised release on each count, all to run concurrently.[1]

I. Background

The evidence and testimony introduced at petitioner's trial were that a commander with the Modoc County Interagency Narcotics Task Force observed a marijuana garden during an aerial reconnaissance flight on September 27, 2002. The garden was exposed, not indoors, in a remote, forested area. The garden grew on private property known as the Sage Creek Ranch (also referred to at trial as the Jennings Ranch, for its owner, Richard Jennings) and spread into the Modoc National Forest. It was approximately the size of a football field. RT 151-52.[2]

It appears Jennings kept a home on the ranch property, but from the record excerpts and evidence submitted in support of and opposition to the pending § 2255 motion, it is not entirely clear where the marijuana garden was located in relation to that residence. The government, relying on transcript excerpts from the trial, describes the layout of the property as follows:

> Careful reconnaissance of the area surrounding the garden found no paths or trails of ingress or egress, except a dirt road that was controlled by a locked gate at the Jennings Ranch complex. This dirt road continued about three to four miles beyond the gate near the Jennings ranch house and stopped near the stock water tank. An all terrain vehicle ("ATV") trail branched off from the dirt road and led to the marijuana garden. The officers concluded that all of the massive amount of supplies, equipment, food, and workers that were used to grow the marijuana passed through the locked gate and were transported into the garden by vehicle driven on that dirt road and ATV trail.

Answer at 6 (Doc. No. 186) (record citations omitted).

---

[1] On October 14, 2005, the Ninth Circuit remanded the case for reconsideration of the sentence in light of United States v. Booker, 543 U.S. 220 (2005). On remand, the district court affirmed its original sentence.

[2] Herein, "RT" refers to the court reporter's transcript of the trial, excerpts of which are attached to the government's answer as Appendix 3. In referencing other documents, the court uses the page numbering assigned by its CM/ECF system, where applicable.

Drug enforcement officers entered the ranch property without a warrant on September 27, the same day the marijuana garden was discovered. They seized 6,451 marijuana plants over the next two days. RT 319:10-11. Law enforcement officers discovered a nearby campsite with a kitchen area; there were also sleeping areas strewn with sleeping bags on opposite sides of the garden. RT 186:16-187:8; 255:5-256:7. They also found a loaded Ruger, Model10-22, .22 caliber rifle resting against a tree near the marijuana garden. RT 193:7-24; 530:14-531:22.

Quesada-Garcia, the movant, was the manager at the Jennings Ranch when drug enforcement authorities raided it. RT 1287:4-5. He did not live on the ranch property but resided in town with his wife. Answer (Doc. No. 186), Appendix 1- Declaration of Dwight M. Samuel at 3.[3] After Quesada-Garcia was indicted, Dwight M. Samuel was appointed as his counsel. Samuel has submitted a declaration under penalty of perjury wherein he states that he discussed alternatives to trial, in the form of plea agreements with the government, with his client "[o]n many occasions" but the alternative he proposed were all rejected by movant. Id. at 6. Quesada-Garcia went to trial, testified on his own behalf, and was found guilty on all three charges brought against him. As the district court summarized at movant's first sentencing hearing, "the evidence was overwhelming that [Quesada-Garcia] was actively involved" in supplying water, equipment and communication necessary to maintain the marijuana garden. RT 1286:25-1287:8. The district court also observed that "[t]he evidence seemed to be . . . pretty clear that this grow would never have taken place without [Quesada-Garcia]." RT 1287:8-1287:10.

---

[3] By order filed January 11, 2010 (Doc. No. 182), the court found that Quesada-Garcia had waived the attorney-client privilege with respect to his three claims of ineffective assistance of trial counsel that he alleges in his § 2255 motion. The court gave the government leave to obtain a declaration from attorney Dwight Samuel, Quesada-Garcia's trial counsel, as discovery into "what counsel did or did not do and why" on the decisions his client avers were constitutionally deficient. (Doc. No. 182 at 7.) By separate order issued that same date, the court limited the use of information and materials obtained by respondent as a result of movant's waiver of the attorney-client privilege. (Doc. No. 183.)

Movant Quesada-Garcia now seeks to have his conviction and sentence vacated pursuant to 28 U.S.C. § 2255, alleging three claims of ineffective assistance of counsel: (1) failure to move to suppress the contraband evidence (the marijuana and a rifle) that formed the basis of the prosecution's case; (2) failure to obtain an English/Spanish interpreter to aid movant's understanding of the criminal proceedings and his communication with his lawyer;[4] and (3) inadequate advice concerning alternatives to standing trial, especially the option of making an "open plea," untethered to any promise to cooperate with the government in its case against other charged defendants. The government has filed an answer in opposition to the motion, and Quesada-Garcia has filed a traverse.

II.   Standards under § 2255

Title 28 U.S.C. § 2255(a) states that "[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed sentence to vacate, set aside or correct the sentence." A court that receives a motion filed under § 2255 "must grant a hearing to determine the validity of a petition brought under that section, '[u]nless the motions and files and records of the case conclusively show that the petitioner is entitled to no relief.'" United States v. Blaylock, 20 F.3d 1458, 1465 (9th Cir. 1994) (quoting 28 U.S.C. § 2255). The court may deny a hearing on such a motion if the movant's allegations, viewed against the record, fail to state a claim for relief or "are so palpably incredible or patently frivolous as to warrant summary dismissal." United States v. McMullen, 98 F.3d 1155, 1159 (9th Cir. 1996) (internal quotations omitted). To earn the right to a hearing, therefore, a movant must make specific factual allegations that, if true, would entitle

/////

---

[4] Quesada-Garcia also suggests, without fully discussing, that the absence of an interpreter deprived him of his rights to due process and to confront and cross-examine the witnesses against him.

4

him to relief. Id. Merely conclusory statements are insufficient to warrant a hearing under § 2255. United States v. Hearst, 638 F.2d 1190, 1194 (9th Cir. 1980).

For the reasons that follow, the court finds that the motion, record and arguments presented conclusively establish that movant Quesada-Garcia is not entitled to relief. Therefore, the court need not hold a hearing under § 2255.

III.   Ineffective Assistance of Counsel

The U.S. Supreme Court has clearly defined the elements necessary to establish that a criminal defendant's legal representation was so ineffective it violated the defendant's right to counsel under the Sixth Amendment:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.

Strickland v. Washington, 466 U.S. 668, 687 (1984). "[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." Id. at 688. A defendant claiming ineffective assistance of counsel bears the burden of establishing counsel's performance as unreasonable. It is a fairly high threshold of proof, since a court must presume "that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made." Id. at 689.

It also is petitioner's burden to establish prejudice. "A defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

/////

followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

A. Whether counsel was ineffective in not moving to suppress evidence

Petitioner's first claim rests on his allegation that the warrantless search of the Jennings Ranch and the warrantless seizure of the marijuana and rifle were illegal under the Fourth Amendment. He avers that his trial attorney "incompetently failed to move for the suppression of contraband, marijuana and firearms, used against [him] at trial." Pet., Memorandum at 5. The Supreme Court has defined the standard for assessing such a claim:

> Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice.

Kimmelman v. Morrison, 477 U.S. 365, 375 (1986).

The government responds that Quesada-Garcia has no legal right or standing to contest the legality of the search. It argues that he carries the burden of submitting evidence that establishes he has standing under the Fourth Amendment to challenge the legality of the warrantless search and seizure that led to his prosecution, and that he has failed to do so. The government's argument is a persuasive one.

"[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable[.]" Minnesota v. Carter, 525 U.S. 83, 88 (1998). A reasonable expectation is "one that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to the understandings that are recognized and permitted by society." Id. (internal quotation omitted). However,

> the extent to which the Fourth Amendment protects people may depend on where those people are. We have held that "capacity to claim the protection of the Fourth Amendment depends . . . upon

6

        whether the person who claims the protection of the Amendment
has a legitimate expectation of privacy in the invaded place."

Id. (citation omitted).

        The Jennings Ranch was Quesada-Garcia's workplace, not his home. His use of it, therefore, was commercial. Indeed, he describes it as such in his traverse: "Jennings Ranch is a cattle [ranch] that grows cows [sic] and produces its own plants to feed the bovines. The operation as managed by petitioner includes feeding the bovines, to grow the hay for the cattle and maintenance of the ranch." Traverse at 4 (Doc. No. 191). Movant Quesada-Garcia goes on to argue that his status as ranch manager gave him a reasonable expectation of privacy within the entire ranch property. Id. He states that he "had express authority from the owner of the ranch to exclude, in his manager capacity, uninvited visitors." Id.

        "Property used for commercial purposes is treated differently for Fourth Amendment purposes from residential property. 'An expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home.'" Id. at 90 (quoting New York v. Burger, 482 U.S. 691, 700 (1987)). Private employees may have, in some circumstances, a residual expectation of privacy in places such as an office. See Mancusi v. DeForte, 392 U.S. 364, 369-70 (1968); United States v. Ziegler, 474 F.3d 1184, 1189-90 (9th Cir. 2007). However, Quesada-Garcia's employment status as ranch manager is not, by itself, enough to give him standing to challenge the search of the ranch. "[W]e have rejected managerial authority alone as sufficient for Fourth Amendment standing." United States v. SDI Future Health, Inc., 568 F.3d 684, 695 (9th Cir. 2009). Quesada-Garcia must, therefore, point to more than just his role as ranch manager to make the case that he had a reasonable expectation of privacy in the area where the garden and its 6,451 marijuana plants were found.

        In his final submission to the court, Quesada-Garcia argues that "in order to seize the marijuana plants and the . . . rifle, the agents necessarily gained access . . . by invading the area immediately adjacent to the house, which is clearly a 'curtilage.'" Supplemental Reply

7

1  (Doc. No. 195) at 2.  Neither party has provided a clear picture of the proximity of the marijuana
2  garden to the Jennings ranch house or of the placement of any fencing or other physical boundary
3  that would guide the court in making a determination of where the curtilage of the ranch house
4  actually lay, but its precise location is inapposite to determining whether Quesada-Garcia can
5  invoke the curtilage as the ground on which he can challenge the search of the ranch property.
6  He cannot.

7  "The curtilage concept originated at common law to extend to the area
8  immediately surrounding a dwelling house[.]"  Dunn, 480 U.S. at 300.  The coverage of the
9  Fourth Amendment's over the curtilage therefore only protects those who have an expectation of
10  privacy in the home itself.  The curtilage is

> the area to which extends the intimate activity associated with the "sanctity of a man's home and the privacies of life."  The protection afforded the curtilage is essentially a protection of families and personal privacy in an area immediately linked to the home, both physically and psychologically, where privacy expectations are most heightened.

15  California v. Ciraolo, 476 U.S. 207, 213 (1986) (citation omitted).  Quesada-Garcia has not
16  shown he had any intimate link to the Jennings ranch home, nor is any implied.  He offers no
17  facts by which he, as a ranch manager who kept his own residence off the ranch property, could
18  be considered a person with a reasonable expectation of privacy in his employer's private ranch
19  home and curtilage.  The court is not aware of any authority to support such a position, and
20  Quesada-Garcia has not provided any.  Nor does movant go so far as to allege the marijuana
21  garden was enclosed within the curtilage of the ranch house.  Instead, he alleges that agents
22  "invaded" the curtilage on their way to the area where the marijuana plants grew.  There is no
23  evidence that the garden itself was within the curtilage of the ranch house, and even if it was,
24  Quesada-Garcia is not a person with a reasonable expectation of privacy in that home and its
25  curtilage.
26  /////

Quesada-Garcia has not established that he had standing under the Fourth Amendment to challenge the search of the property or the seizure of the marijuana plants and firearm introduced into evidence at his trial. Having failed to carry that burden, he cannot meet his ultimate burden of showing that his trial counsel would have prevailed on a motion to suppress that evidence had one been filed. There is no merit, therefore, in his claim that his counsel was ineffective in failing to bring such a motion to suppress evidence.

B. <u>Whether counsel was ineffective in not obtaining an interpreter</u>

Quesada-Garcia next claims that "he was disadvantaged during trial due to lack of a Spanish interpreter[,] depriving him of his due process, to the effective assistance of counsel, and to confront and cross-examine witnesses." Motion (Doc. No. 155), Attached Memorandum at 8. It is well established that "the presence of an interpreter who provides accurate and complete translations may be necessary to protect the defendant's trial rights." <u>Chacon v. Wood</u>, 36 F.3d 1459, 1464 (9th Cir. 1994) <u>overruled on other grounds</u> by 28 U.S.C. § 2254. "[S]everal circuits have held that a defendant whose fluency in English is so impaired that it interferes with his right to confrontation or his capacity, as a witness, to understand or respond to questions has a constitutional right to an interpreter." <u>United States v. Lim</u>, 794 F.2d 469, 470 (9th Cir. 1986).

The government responds to this claim, first, that to the extent Quesada-Garcia alleges the court violated his right to a fair trial or due process by not appointing an interpreter to assist him, any such claim is procedurally barred because he failed to raise it on direct appeal. "A § 2255 movant procedurally defaults his claims by not raising them on direct appeal and not showing cause and prejudice or actual innocence in response to the default." <u>United States v. Ratigan</u>, 351 F.3d 957, 962 (9th Cir. 2003). The Ninth Circuit's opinion affirming Quesada-Garcia's conviction does not mention any challenge to the fairness of the trial due to the lack of an interpreter to assist him. <u>See</u> Doc. No. 148. Quesada-Garcia does not allege he raised any due process or trial errors on appeal. Nor does he attempt to show cause why he did not raise any such issues before the Ninth Circuit on appeal. Finally, movant does not argue any prejudice for

having omitted such issues from his appeal. He is barred, therefore, from pursuing any such claims here.

Quesada-Garcia also argues that his trial counsel's failure to obtain an interpreter was ineffective assistance of counsel. The Supreme Court has held that claims of ineffective assistance of counsel generally are not subject to the procedural prerequisite that they be presented first on direct appeal. Therefore, Quesada-Garcia is not barred from litigating this claim on a § 2255 motion. See Massaro v. United States, 538 U.S. 500, 505-506 (2003).

Quesada-Garcia presents this claim in two ways, contending that: (1) his counsel should have obtained an interpreter to assist his client during trial; (2) his counsel should have obtained an interpreter for their pre-trial consultations and preparations. The absence of effective linguistic translation between attorney and client, where it is necessary, may amount to a violation of the right to effective assistance of counsel. Chacon, 36 F.3d at 1465. However, a habeas petitioner who claims the absence of an interpreter constituted a Strickland violation still has the burden to show it was unreasonable for his counsel to fail to obtain the services of an interpreter and to establish prejudice by the lack of one. See Gonzalez v. United States, 33 F.3d 1047, 1051 (9th Cir.1994) (finding attorney's failure to request an interpreter with respect to any language difficulty encountered by the defendant to be reasonable under the circumstances.)

Quesada-Garcia's trial counsel, Dwight M. Samuel, declares that the absence of an interpreter during movant's trial was a tactical decision. Attorney Samuels states in his sworn affidavit that "[t]here is no doubt that defendant has a simple vocabulary and as such might appear to have problems with English. Because of this issue I specifically asked him if he wished to have an interpreter for trial. We discussed both the pros and cons." Answer (Doc. No. 186), Appendix 1 at 3-4. Ultimately, says Samuel, they decided against using an interpreter, to avoid the appearance that "we were trying to hide behind the language barrier . . . when in fact [Quesada-Garcia] had been in the country since 1973 . . . had negotiated the purchase of his home and did transactions in English on a daily basis." Id. at 4. Samuel states that "[i]t was also

decided that if he desired an interpreter at anytime [sic] that he simply had to ask me or advise me that he did not understand and I would immediately request an interpreter." Id.

There is, of course, a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, or "sound trial strategy." Strickland, 466 U.S. at 689. "Tactical decisions after consultation with the client are 'virtually unchallengeable.'" Downs v. Hoyt, 232 F.3d 1031, 1038 (9th Cir. 2000) (quoting Strickland, 466 U.S. at 690). See also United States v. Quintero-Barraza, 78 F.3d 1344, 1349 (9th Cir. 1995) (finding defense counsel's "uninformed judgment call" in failing to make a pretrial motion not to fall outside the wide range of professionally competent assistance and declining to second-guess counsel's tactical decision not to strike a juror who during voir dire stated his belief that one is guilty before proven innocent and admitted that it would be difficult for him to be impartial); Branch v. Yates, No. CIV S-08-CV-2761 JAM CHS P, 2010 WL 4630258, at *13 (E.D. Cal. Nov. 8, 2010) ("Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel, and there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.") (citations omitted).

In this case, the presumption that declining to use an interpreter at trial was a reasonable tactical decision by movant's trial counsel is buttressed by Quesada-Garcia's own failure to explain how he was prejudiced by the absence of an interpreter at trial. First, he does not deny that Samuel advised him to ask for an interpreter immediately if he thought he needed one. Movant does not claim that he asked for an interpreter and was ignored or that interpreter services were refused. Instead, he merely postulates what could have happened when he testified in his own defense without an interpreter, speculating that "he might have made damaging responses to questions he misunderstood, and those responses might have been taken as accurate. By that time, the damage sought to be avoided by an interpreter would already have been done." Traverse at 8-9. But movant Quesada-Garcia points to no particular instances during trial in which his lack of comprehension or inability to communicate actually compromised his, or his

11

counsel's, ability to mount a defense. He does not identify any damning statements he made on the witness stand as a result of his linguistic limitations. Moreover, he does not claim that the prosecution successfully impeached his credibility because he misunderstood a question or line of questioning.

It is not enough for movant to merely assert that testifying without an interpreter was a risky course that might have damaged his case. To prevail under Strickland, a habeas petitioner must show that the damage in fact occurred – that is, he must show prejudice. Quesada-Garcia has not made that showing on his claim that his trial counsel was ineffective in failing to obtain an interpreter to assist movant at trial.

As for Quesada-Garcia's ability to communicate effectively with his lawyer before trial, attorney Samuel has declared that

> [t]hroughout my contacts with the defendant we spoke English, never using an interpreter that I can recall. I asked him if he felt more comfortable with an interpreter at the onset and he indicated at that time if he did not understand that he [would] say so. Defendant . . . never advised me he did not understand.

Answer (Doc. No. 186), Appendix 1 at 3. Quesada-Garcia differs with his trial counsel on this point, arguing that there is "uncontradicted evidence that Mr. Samuel communicated prior to trial with the aid of petitioner's daughter[.]" Traverse (Doc. No. 191) at 8. However, Quesada-Garcia does not say what that uncontradicted evidence is. He has not submitted any sworn statement from his daughter declaring that she had to translate for her father in his conversations with his trial counsel. As with his argument that some insurmountable misunderstanding could have damaged his case during trial, Quesada-Garcia has failed to point to any particular miscommunication with his lawyer that prejudiced his ability to participate in preparing his defense.[5]

---

[5] Even taken as true, this bare allegation about his daughter's participation cannot tenably support Quesada-Garcia's Strickland claim against his trial counsel's efforts to build an effective defense: if his daughter was able to translate for her father and did so, then, at least until the trial started, he and his lawyer successfully surmounted whatever language barrier might have existed between them.

1  On this aspect of his ineffective assistance of counsel claim, too, movant has not made the
2  showing necessary to establish that his counsel provided ineffective assistance under the
3  <u>Strickland</u> standard.
4  In sum, Quesada-Garcia has not presented any evidence that the lack of a Spanish
5  language interpreter prejudiced his defense either before or during trial.  Therefore, his claim that
6  his lawyer was unconstitutionally ineffective in failing to obtain an interpreter should be rejected.
7       C.   <u>Whether counsel was ineffective in advising his client of all plea options</u>
8  Quesada-Garcia's third claim concerns attorney Samuel's performance in advising
9  him regarding different options of pleading guilty and thereby avoiding trial and the risk of a
10 guilty verdict if he proceeded to trial.  A defendant's decision whether to plead not guilty is "a
11 vitally important decision and a critical stage at which the right to effective counsel attaches."
12 <u>Turner v. Calderon</u>, 281 F.3d 851, 879 (9th Cir. 2002).  The first part of the <u>Strickland</u> inquiry in
13 this context is whether "counsel's advice was within the range of competence demanded of
14 attorneys in criminal cases."  <u>Id.</u> (internal quotations and citations omitted).  The second part, in
15 which the court inquires whether there was prejudice, asks whether counsel's performance
16 affected the outcome of the plea process.  <u>Id.</u>  "In other words, to satisfy the 'prejudice'
17 requirement, [the movant] must show that, but for counsel's errors, he would have pleaded guilty
18 and would not have insisted on going to trial."  <u>Id.</u>
19 Although Quesada-Garcia suggests in his initial motion that he heard nothing
20 from his lawyer except encouragement to go to trial, he no longer contends that Samuel failed to
21 communicate and explain the terms of plea agreements offered to him by the government.
22 Rather, he acknowledges in his traverse that he turned down those plea offers and claims he did
23 so because they required him to cooperate with the government in its prosecution of his co-
24 defendants or other suspects.  Movant now says that he "was never going to provide the
25 government with incriminating information against others.  Petitioner's reluctance to cooperate
26 with the Government was the deal-breaker."  Traverse (Doc. No. 191) at 11.  He now contends

that once plea negotiations failed in his case, he thought he had no choice but to proceed to trial and that his trial counsel confirmed this belief. Movant alleges, however, that his lawyer was deficient in "fail[ing] to advise him about the third possibility to resolve his case: [a] 'straight up' plea of guilty." Id. at 12. He claims that "had petitioner been properly advised of the options to plead guilty or to proceed to trial, he would have pleaded guilty, thus avoiding the trial testimony that the court found obstructed justice" and thus obtaining for himself a shorter sentence than the one he received. Motion (Doc. No. 155), Attached Memorandum at 12.

Attorney Samuel, in his declaration, presents a different version of his client's reasons for turning down the government's plea bargain offers. He states that on May 6, 2003, he learned from the prosecution that one of movant's co-defendant might plead and agree to co-operate with the government, but that deal was not yet final. See Answer (Doc. No. 186), Appendix 1 - Samuel Decl. at 6. In the same conversation with the prosecutor, the possibility of a plea bargain and a ten-year sentence for movant was suggested, but without any formal offer being made by the government. Attorney Samuel declares that he "discussed this deal as a possibility with Movant and it was unacceptable." Id. Then, on January 9, 2004, he informed movant of yet another informal offer from the government, this time to "plead to a five-year term." Id. His client responded that the offered five years was "too much time." Id. Attorney Samuel states that he discussed the five-year offer again with his client on February 26, 2004, and that once again movant "specifically rejected the offer." Id. Attorney Samuel summarizes his representation of movant during this pre-trial stage of the proceedings as follows:

> On many occasions alternatives to going to trial were discussed. The concept of pleading and getting a 5k cooperation agreement was discussed and rejected because it involved going to jail and possible deportation. I had advised Movant that a conviction for the drug offense charged in fact would result in deportation. I also pursued a possible misprision plea but this was rejected by the prosecution. I advised Movant of this fact.

Id. at 6. Attorney Samuel states that he also explained to Quesada-Garcia that he had made an incriminating statement to authorities while his case was pending in state court, its first forum,

14

and explained further to movant "how [that] created problems with his defense, pointing out the only potential defense would be duress[.] I advised him that I felt that the facts would not support a duress defense and advised Movant to seek a resolution." Id. Samuel states that after his client was found guilty at trial, movant only then "solicited me to offer information to the prosecution for a reduction in his anticipated sentence." Id.

Samuel's declaration strongly suggests that Quesada-Garcia's real "deal-breaker" was having to serve time in prison and the near certainty of deportation if he was convicted of a a drug trafficking offense, not the inclusion of a cooperation clause in any government plea offer. Attorney Samuels explains that, in the end, "it was only after full and complete discussion and Movant's rejections of all the alternatives that I said that our only choice is to go to trial." Id. at 7. Samuel concludes that he is "certain that Movant was totally aware of his right to plead to the charges but just as certain that he would not do so based upon his rejection of offers for significantly less jail time." Id.

There is some out-of-circuit authority for the proposition that a defendant who refuses to accept a plea offer requiring cooperation with the government should still be informed by his counsel of the option of entering an open plea, and that it may be deficient performance for his counsel to fail to do so. See United States v. Booth, 432 F.3d 542, 549 (3rd Cir. 2005). Attorney Samuel's declaration does not explicitly state that he discussed the possibility of an open plea with his client. Certainly, counsel's declaration stating that he was "certain that Movant was totally aware of his right to plead to the charges" is relevant, but it is not the same as saying something along the lines of, "I told my client he could still plead guilty to all charges and hope to receive a lesser sentence after negotiations with prosecutors had failed." On the other hand, it can fairly be inferred that movant's attorney did advise movant of the possibility of an open plea from counsel's statement that he told Quesada-Garcia that their only choice was trial "only after full and complete discussion and . . . rejections of all the alternatives." Answer (Doc. No. 186), Appendix 1 - Samuel Decl. at 7.

Moreover, even if this court drew the opposite inference, that counsel did not inform his client of the "open plea" option, "[t]he determination of whether trial counsel's failure to inform [the defendant] that he could enter an open plea was constitutionally deficient must be viewed through the prism of the specific facts of this case." Booth, 432 F.3d at 549. That determination must also consider whether Quesada-Garcia was prejudiced by his ignorance of the "open plea" option – and on that issue attorney Samuel's affidavit is more conclusive. Id. at 546-47.

"[T]o satisfy the 'prejudice' requirement, [the movant] must show that, but for counsel's errors, he would have pleaded guilty and would not have insisted on going to trial." Turner, 281 F.3d at 879. More precisely, in the context of this case, movant must show that there is a reasonable probability that but for counsel's ineffective assistance he would have pleaded guilty and received a lesser sentence. See Strickland, 466 U.S. at 694; see also United States v. Grammas, 376 F.3d 433, 438 (5th Cir. 2004). Here, the most reasonable probability is that Quesada-Garcia would not have elected to enter an open plea to all counts in which he was charged even if his counsel had specifically advised him that he could elect to do so. In this regard, Quesada-Garcia does not dispute attorney Samuel's declaration that movant did indicate his willingness to provide cooperation to the prosecution in order to reduce the sentence he was facing after he was found guilty at trial. Movant also does not deny that his reasons for rejecting the government's earlier plea offers were his refusal to accept "too much" prison time and the high probability of deportation if he were convicted of the drug trafficking charges he faced.[6] These effective concessions impeach movant's claim that he turned down the plea offers because cooperating with the government against other defendants was a "deal-breaker" for him. Instead,

---

[6] The notion that these were the reasons which motivated movant in refusing the government's plea offers is supported by the fact that after discussing the governments offers with his client, movant's counsel unsuccessfully attempted to negotiate a plea bargain based upon a plea to misprision of a felony. Answer (Doc. No. 186), Appendix 1 - Samuel Decl. at 6. Such a plea arguably would have addressed movant's concerns regarding the length of his prison sentence and the certainty of deportation.

Quesada-Garcia's consistent rejections of the best outcomes he could get short of acquittal – i.e., the plea offers requiring his cooperation – are evidence that, even if Quesada-Garcia was totally unadvised on the "open plea" option, he probably would not have elected to pursue that course. For, an open plea would have meant even more prison time and deportation. Those factors, not cooperation with the government, appear to have been the real deal-breakers that led Quesada-Garcia to reject the government's offers. They almost certainly would have led him to decide against an open plea as well, even if he had been specifically advised of that option. See Hudson v. United States, Crim. No. 03-367 (RHK/AJB), 2011 WL 834015, at 3 (D. Minn. Mar. 4, 2011) (rejecting petitioner's ineffective assistance claim based on counsel's alleged failure to advise her of sentencing implications of proceeding to trial because movant failed to show prejudice); Darby v. United States, Crim. No. 10-1437 (DMC), 2010 WL 4387511, at *6 (D. N.J. Oct. 28, 2010) ("Unlike the defendant in Booth, Petitioner never expressed a willingness to plead guilty to the charges against him."); United States v. Ontiveros, No. CR S-02-418 GEB GGH P, 2010 WL 445041, at *9 (E.D. Cal. Feb. 2, 2010) ("Because movant in the instant case did not want to plead guilty under any circumstances, the "open" plea was not an option, as it was in Booth.")

      The court finds that Quesada-Garcia has failed to demonstrate that he probably would have entered an open plea of guilty to all charges. He has therefore failed to show he was prejudiced by his counsel's alleged failure to specifically advise him with respect to that option. For that reason, this aspect of his ineffective assistance of counsel claim should also be rejected.

## CONCLUSION

      Accordingly, IT IS HEREBY RECOMMENDED that:

      1. Movant's July 30, 2008, motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 (Doc. No. 155) be denied; and

      2. The Clerk of the Court be directed to close the companion civil case No. 2:08-cv-1805.

/////

1    These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time waives the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: November 14, 2011.

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

hm
ques0519.257